/S

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff

- v. -

MUTHANNA AL-HANOOTI,

Defendant.
_____/

Case: 2:08-cr-20083
Judge: Borman, Paul D
Referral MJ: Morgan, Virginia M
Filed: 02-13-2008 At 04:38 PM
INDI USA V. SEALED MATTER 1DFT (DA)

VIOLATIONS: 18 U.S.C. §§ 371,
1001(a)(2); 50 U.S.C. § 1705

## INDICTMENT

The Grand Jury charges:

### COUNT ONE

**(Conspiracy - 18 U.S.C. §§ 371, 951(a))**

D-1  MUTHANNA AL-HANOOTI

#### I. INTRODUCTORY ALLEGATIONS

At all times material to this Indictment:

**A.   The Defendant**

1.   Defendant MUTHANNA AL-HANOOTI, a naturalized United States citizen born in Iraq, was a resident of the Eastern District of Michigan.

2.   From approximately 1994 through 1999, 2001 through 2002, and 2005 through mid-2006, defendant AL-HANOOTI was employed by Life for Relief and Development (LRD) as its public relations coordinator responsible for, among other things, LRD's lobbying efforts.

3.   LRD is an organization based in Southfield, Michigan that has been granted tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. LRD was created after the

first Gulf War in response to the economic sanctions that were imposed by the United States on Iraq. LRD has offices in various locations across the world, and it opened an office in Baghdad, Iraq in the late 1990s.

4. From approximately 2000 through 2005, many of LRD's political activities in the United States were handled by an entity called Focus on American and Arab Interests and Relations (FAAIR). This entity was funded and controlled by LRD. The President of FAAIR was defendant AL-HANOOTI.

**B.  The Government of Iraq**

5. The Government of Iraq (GOI) is a foreign government. From 1979 to approximately March 2003, Iraq was ruled by Saddam Hussein and his regime.

6. Beginning in or about 1990 and continuing until in or about July 2004, the United States viewed the GOI as a threat to its national security and declared a national emergency with regard to the GOI.

7. The Iraqi Intelligence Service (IIS) was the foreign intelligence arm of the GOI under Saddam Hussein.

8. Unindicted co-conspirator number one is a former officer of the IIS.

9. At no time was defendant AL-HANOOTI:

(a) a duly accredited diplomatic or consular officer of a foreign government, recognized by the United States Department of State;

(b) an officially and publicly acknowledged and sponsored official or representative of a foreign government; or

(c) an officially and publicly acknowledged and sponsored member of the staff of,

2

or employee of, any such officer, official, or representative of a foreign government.

## C. The Iraqi Sanctions Regulations

10. Under the International Emergency Economic Powers Act (Title 50, United States Code, Sections 1701 through 1706) (IEEPA), the President of the United States has the authority to deal with any unusual or extraordinary threat, arising in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States. IEEPA authorizes the President, upon declaring a national emergency with respect to such a threat, to take steps to deal with the national emergency, including investigating, regulating, and prohibiting any transaction involving any property in which a foreign country or national thereof has any interest. The President's formal directives in this regard are issued through Executive Orders which have the force and effect of law.

11. On or about August 2, 1990, under the authority of IEEPA, and following Iraq's invasion of Kuwait, President George H. W. Bush issued Executive Order 12722, which declared a national emergency with respect to Iraq. According to the directive, the policies and actions of the Government of Iraq constituted an unusual and extraordinary threat to the national security and foreign policy of the United States. Executive Order 12722 proscribed specific conduct related to these national security concerns. On or about August 9, 1990, the President, acting under the authority of IEEPA and the United Nations Participation Act (22 U.S.C. § 287c) issued Executive Order 12724, taking additional steps with respect to the national emergency declared in Executive Order 12722. Both Executive Orders empowered the Secretary of the Treasury to promulgate regulations and take other action necessary to fully realize the purposes of these Executive Orders. Thereafter, Presidents of the United States

continued, on an annual basis, the national emergency with respect to Iraq.

12. Pursuant to this authority, the Secretary of Treasury issued the Iraqi Sanctions Regulations, Title 31, Code of Federal Regulations, Part 575. These regulations are administered and enforced by the Department of Treasury's Office of Foreign Assets Control (OFAC) and state, in relevant part:

> (a) "[N]o property or interests in property of the Government of Iraq that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. 575.201(a). This prohibition applies "to transactions by U.S. persons in locations outside the United States with respect to property in which the U.S. person knows, or has reason to know, that the Government of Iraq has or has had an interest." 31 C.F.R. 575.408(a). For example, "a U.S. person may not, within the United States or abroad, purchase, sell, finance, insure, transport, act as a broker for the sale or transport of, or otherwise deal in, Iraqi crude oil or petroleum products refined in Iraq." 31 C.F.R. 575.408(c)(1);
>
> (b) "[N]o U.S. person may deal in property of Iraqi origin exported from Iraq after August 6, 1990, property intended for exportation to Iraq, or property intended for exportation from Iraq to any other country, nor may any U.S. person engage in any activity that promotes or is intended to promote such dealing." 31 C.F.R. 575.206;
>
> (c) "[N]o U.S. person may commit or transfer, directly or indirectly, funds or other financial or economic resources to the Government of Iraq or any person in Iraq." 31 C.F.R. 575.210 ; and,
>
> (d) "Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this subpart, is hereby prohibited. Any attempt to violate the prohibitions set forth in this part is hereby prohibited. Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited." 31 C.F.R. 575.211.

13. On or about May 23, 2003, after the fall of the Saddam Hussein regime, OFAC issued a General License that suspended most economic sanctions against Iraq, including those

described herein. On or about July 29, 2004, the President issued Executive Order 13350, which, among other things, terminated the national emergency declared in Executive Order 12722 and revoked Executive Orders 12722 and 12724.

### D.  Oil for Food Program

14. On or about August 6, 1990, the United Nations imposed economic sanctions on the GOI. These sanctions prohibited member states of the United Nations from, among other things, trading in any Iraqi commodities or products. The United Nations continued to enforce these sanctions up to and including in or about 2003. On or about April 14, 1995, the Security Council of the United Nations adopted Resolution 986, which authorized the GOI to sell oil under certain conditions. The United Nations Office of Iraq Programme, Oil-for-Food (Oil-for-Food Program) was subsequently established to administer, among other things, the sale of oil and purchase of humanitarian goods by Iraq.

15. During the operation of the Oil-for-Food Program, federal law prohibited United States companies and individuals from engaging in a variety of transactions with the Government of Iraq unless they received a license issued by the Department of Treasury's Office of Foreign Assets Control.

16. Under the Oil-for-Food Program, the GOI alone had the power to select the companies and individuals who received the rights to purchase Iraqi oil. Officials at the highest levels of the GOI selected a group of companies and individuals to receive the rights to purchase certain quantities of Iraqi oil (frequently referred to as "allocations" of oil). These companies and individuals were able to profit by selling their allocations to brokers and/or companies capable of transporting the oil to a refinery. GOI oil contracts were granted through the State Oil

Marketing Organization (SOMO), which was established and controlled by the Ministry of Petroleum of the GOI.

## II. THE CONSPIRACY

17. Beginning in or about 1999 and continuing until in or about March, 2003, in the Eastern District of Michigan, Southern Division and elsewhere, defendant MUTHANNA AL-HANOOTI conspired and agreed with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit: to knowingly act in the United States as an agent of a foreign government, specifically, the GOI, without prior notification to the Attorney General as required by law, in violation of Title 18, United States Code, Sections 371 and 951(a).

### A. Manner and Means

It was part of the conspiracy that:

18. Defendant AL-HANOOTI would travel to Iraq and meet in Iraq with co-conspirators who were officers of the IIS.

19. Defendant AL-HANOOTI would communicate with co-conspirators who were officers of the IIS.

20. Defendant AL-HANOOTI would receive direction from, and act under the control of, co-conspirators who were officers of the IIS.

21. Defendant AL-HANOOTI would report to the IIS information about members of the United States Congress who were of interest to the IIS.

22. Defendant AL-HANOOTI would organize delegations from the United States Congress to travel to Iraq.

23. Defendant AL-HANOOTI would travel with delegations from the United States

Congress on trips to Iraq.

24. Defendant AL-HANOOTI would receive compensation for services that he had provided to the IIS.

25. Defendant AL-HANOOTI would misrepresent, conceal, hide, and cause to be misrepresented, concealed, and hidden, for the purposes of and acts done in furtherance of the conspiracy, to avoid detection and apprehension by law enforcement authorities.

**B.  Overt Acts**

26. In furtherance of the conspiracy, and for the purpose of effecting its unlawful objectives, defendant AL-HANOOTI and other unindicted co-conspirators committed overt acts, in the Eastern District of Michigan, Southern Division, and elsewhere, including but not limited to the following:

    a. In the late 1990s, the IIS targeted LRD and defendant AL-HANOOTI to cooperate with and serve the IIS.

    b. In or about 1999 or 2000, defendant AL-HANOOTI met in Iraq with unindicted co-conspirator number one. During this meeting, unindicted co-conspirator number one requested that LRD and defendant AL-HANOOTI publicize within the United States the negative effects that the Iraqi Sanctions Regulations had upon the people of Iraq, and that defendant AL-HANOOTI bring to Iraq delegations from the United States Congress.

    c. Between in or about 1999 and 2002, defendant AL-HANOOTI provided to the IIS a list of members of the United States Congress whom AL-HANOOTI believed favored lifting of the Iraqi Sanctions Regulations.

    d. Between in or about 1999 and 2002, AL-HANOOTI provided to the IIS a

written strategy on how to obtain the lifting of the Iraqi Sanctions Regulations.

  e. Between in or about 1999 and September 2002, defendant AL-HANOOTI met again in Iraq with the IIS, which again requested that defendant AL-HANOOTI coordinate a delegation to Iraq to include members of the United States Congress.

  f. In or about September 2002, defendant AL-HANOOTI helped to organize a delegation to Iraq, which included three members of the United States Congress (2002 Congressional Delegation).

  g. In or about September & October 2002, an IIS officer directed an intermediary in the Eastern District of Michigan (the intermediary) to pay the 2002 Congressional Delegation's travel expenses.

  h. On or about September 24, 2002, the intermediary paid LRD $24,000 to pay for the 2002 Congressional Delegation's travel expenses.

  i. In or about October 2002, defendant AL-HANOOTI traveled to Iraq with the 2002 Congressional Delegation.

  j. On or about October 15, 2002, the intermediary paid LRD $10,000, to pay additional travel expenses of the 2002 Congressional Delegation.

  k. As compensation for services that defendant AL-HANOOTI had rendered to the Government of Iraq, including his organizing and leading the 2002 Congressional Delegation, with the concurrence of unindicted co-conspirator number one, on or about December 22, 2002 the Vice President of Iraq directed the Iraqi Minister of Petroleum to allocate to defendant AL-HANOOTI a quantity of two million barrels of oil.

  l. On or about January 23, 2003, defendant AL-HANOOTI advised SOMO

that he had assigned his two million barrel allocation of oil to LARU LTD. LARU LTD. was a company incorporated in the Country of Cyprus.

      m.    On or about February 9, 2003, defendant AL-HANOOTI contacted SOMO to discuss the assignment of his oil allocation to LARU LTD., and he was informed by a SOMO official that SOMO was willing to execute a contract with LARU LTD. acting on his behalf.

      n.    On or about February 23, 2003, a SOMO official acting on behalf of SOMO, and LARU LTD., acting on behalf of defendant AL-HANOOTI, entered into a contract with entitling LARU LTD. to purchase two million barrels of Iraqi oil (the Oil Contract).

      o.    On or about February 27, 2003, the GOI Minister of Petroleum ratified the Oil Contract.

All in violation of Title 18 United States Code, Sections 371 and 951(a).

## COUNT TWO

### (Contract to Purchase Iraqi Oil – 50 U.S.C. § 1705)

D-1 MUTHANNA AL-HANOOTI

27.     Paragraphs 1 through 26 of Count One of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein.

28.     At no time did defendant MUTHANNA AL-HANOOTI receive a license or other authorization from OFAC to procure, transfer, or resell Iraqi oil or any interest in Iraqi oil.

29.     In or about December 2002, through in or about February 2003, in the Eastern District of Michigan and elsewhere, defendant MUTHANNA AL-HANOOTI, unlawfully, knowingly, and willfully caused a contract between SOMO and LARU LTD. to be procured on his behalf, committing LARU LTD. to transfer money to the Government of Iraq in exchange for two million barrels of Iraqi oil, without having obtained prior authorization from OFAC.

All in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 575.201, 575.206, 575.210, & 575.211; Title 18, United States Code, Section 2.

## COUNT THREE

### (False Statement – 18 U.S.C. § 1001(a)(2))

D-1 MUTHANNA AL-HANOOTI

30. Paragraphs 1 through 26 of Count One of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein

31. On or about March 27, 2007, defendant MUTHANNA AL-HANOOTI was interviewed by the Federal Bureau of Investigation. In that interview, defendant AL-HANOOTI stated that (a) he had never met with any person whom he knew to be an IIS official; (b) the IIS had never asked him to do anything for them; (c) he had never been offered an oil contract by the GOI.

32. On or about March 27, 2007, in the Eastern District of Michigan, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the Executive Branch of the Government of the United States, defendant MUTHANNA AL-HANOOTI knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation to agents of the FBI, to wit: that he had never met with any person whom he knew to be an IIS official when, in fact, defendant AL-HANOOTI then and there knew that he had previously met with one or more IIS officials.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## **COUNT FOUR**

**(False Statement – 18 U.S.C. § 1001(a)(2))**

D-1 MUTHANNA AL-HANOOTI

33. Paragraphs 1 through 26 of Count One, and paragraph 31 of Count Three, of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein

34. On or about March 27, 2007, in the Eastern District of Michigan, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the Executive Branch of the Government of the United States, defendant MUTHANNA AL-HANOOTI knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to agents of the FBI, to wit: that the IIS had never asked him to do anything for them when, in fact, defendant AL-HANOOTI then and there knew that the IIS had asked him to arrange for delegations from the United States Congress to travel to Iraq.

All in violation of Title 18, United States Code, Section 1001(a)(2).


_____
KARL A. SANDOVAL
Trial Attorney
U.S. Department of Justice


Dated:  February 13, 2008

## COUNT FIVE

### (False Statement – 18 U.S.C. § 1001(a)(2))

D-1 MUTHANNA AL-HANOOTI

 35. Paragraphs 1 through 26 of Count One, and paragraph 31 of Count Three, of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein

 36. On or about March 27, 2007, in the Eastern District of Michigan, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the Executive Branch of the Government of the United States, defendant MUTHANNA AL-HANOOTI knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation to agents of the FBI, to wit: that he had never been offered an oil contract by the GOI when, in fact, defendant AL-HANOOTI then and there knew that the GOI had awarded him a two million barrel allocation of Iraqi oil and that he had arranged for LARU LTD. to enter into a contract with a GOI entity to purchase these two million barrels of oil on his behalf.

 All in violation of Title 18, United States Code, Section 1001(a)(2).

                THIS IS A TRUE BILL

                S/Grand Jury Foreperson

MICHAEL J. MULLANEY
Acting United States Attorney

S/
───────────────
MICHAEL D. TAXAY
Trial Attorney
U.S. Department of Justice

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover | Case: 2:08-cr-20083<br>Judge: Borman, Paul D<br>Referral MJ: Morgan, Virginia M<br>Filed: 02-13-2008 At 04:38 PM<br>INDI USA V. SEALED MATTER 1DFT (DA) |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complet

| Companion Case Information | Companion Case Number: 2:07-cr-20438 |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: Cleland/Scheer |
| x Yes    ☐ No | AUSA's Initials: MDT |

Case Title: USA v. MUTHANNA AL-HANOOTI

County where offense occurred : Oakland County

Check One:    X Felony    ☐ Misdemeanor    ☐ Petty

　　X　Indictment/____Information --- **no** prior complaint.
　　____Indictment/____Information --- based upon prior complaint
　　____Indictment/____Information --- based upon **LCrR 57.10 (d)**

## Superseding Case Information:

**Superseding to Case No:** _____   **Judge:** _____

☐ Original case was terminated; no additional charges or defendants.
☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| Defendant name | Charges |
|---|---|
| Muthanna Al-Hanooti | 18 U.S.C. §§ 371, 1001(a)(2); 50 U.S.C. § 1705; |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

February 13, 2008
　　Date

MICHAEL D. TAXAY
Trial Attorney
10th & Constitution Ave., N.W.
Washington, D.C. 20530
Phone: (202) 514-9473
Fax: (202) 514-8714
E-Mail address: michael.taxay@usdoj.gov

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/20/04