IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:08-CR-20083 |
| | : | |
| v. | : | |
| | : | |
| MUTHANNA AL-HANOOTI, | : | |
| Defendant. | : | |
| | / | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned attorneys, respectfully submits this memorandum to inform the Court of its position at sentencing. Based on the United States Sentencing Commission Guidelines ("the Guidelines"), the terms of the parties' Rule 11 Plea Agreement, and the factors listed in 18 U.S.C. § 3553(a), the Government requests that the Court impose a sentence of 46 months.

## I. INTRODUCTION

On June 21, 2010, Defendant Muthanna Al-Hanooti ("Al-Hanooti") pled guilty, pursuant to a Rule 11 Plea Agreement, to violating the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1705).[1] Under the provisions of the Rule 11 Plea Agreement, the parties agreed that the Government would seek a term of imprisonment no greater than the low end of the Guidelines range applicable at a Total Offense Level of 23. The Guidelines range is 46-57

---

[1] The five count Indictment charges Al-Hanooti with conspiracy to act as an unregistered agent of a foreign government, 18 U.S.C. §§ 371, 951(a); violation of the Iraqi Sanctions Regulations, 50 U.S.C. § 1705; and making false statements, 18 U.S.C. § 1001(a)(2).

months.

## II.  STATEMENT OF FACTS

### A.  Defendant Muthanna Al-Hanooti

According to the Presentence Investigation Report, Defendant is a naturalized U.S. citizen who came to the United States from Iraq in 1980.  For most of the period between 1995 and 2006 Defendant was employed by Life for Relief and Development ("LRD"), a tax exempt charity created after the first Gulf War in response to the economic sanctions that the United States imposed on Iraq.  Defendant performed a variety of functions directly for LRD, including public relations and lobbying, as well as through an entity called Focus on American and Arab Interests and Relations ("FAAIR").  Defendant was the President of FAAIR, which was funded and controlled by LRD.  Defendant has told the FBI that FAAIR was formed to lobby against the sanctions that were imposed on Iraq during the Saddam Hussein regime and to promote good relations between the U.S. and Iraq.

### B.  International Emergency Economic Powers Act

Under IEEPA, the President of the United States has the authority to deal with any unusual or extraordinary threat, arising in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States.  IEEPA's purpose is to "delimit the President's authority to regulate international economic transactions during wars or national emergencies."  *Sen. Rep. 95-466*, 95th Cong., 1st Sess 2 (1977); *see also United States v. Islamic American Relief Agency*, 2009 WL 3834130, at *1 (W.D. Mo. Nov. 13, 2009) (describing the history and purpose of IEEPA and the Iraqi Sanctions Regulations).  IEEPA authorizes the President, upon declaring a national emergency with respect to such a threat, to

2

take steps to deal with the national emergency, including investigating, regulating, and prohibiting any transaction involving any transaction involving any property in which a foreign country or national thereof has any interest. Once such a national emergency is declared, the President has broad power under IEEPA to impose controls over economic transactions involving transfers abroad and foreign property controls. *See* M. Maureen Murphy, Executive Order 13438: Blocking Property of Certain Persons Who Threaten Stabilization Efforts in Iraq at 6, Congressional Research Service (2010). The President's formal directives in this regard are issued through Executive Orders which have the force and effect of law.

### C. Iraqi Sanctions Regulations

In August of 1990, following Iraq's invasion of Kuwait, President George H.W. Bush issued two Executive Orders, under the authority of IEEPA, that declared a national emergency with respect to Iraq and directed the Secretary of the Treasury to promulgate regulations and take other action necessary to fully realize the purposes of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury issued the Iraqi Sanctions Regulations, Title 31, Code of Federal Regulations, Part 575. In May 2003, the Department of Treasury suspended most economic sanctions against Iraq and, in July 2004, terminated the national emergency declared in 1990.

### D. Defendant Admits That He Violated IEEPA

Defendant admitted, at the time of his guilty plea, that he violated IEEPA by dealing in an allocation of Iraqi oil.[2] Specifically, in the factual basis provided by Defendant, he admitted

---

[2]This Sentencing Memorandum describes facts relevant to Defendant's plea to Count 2 of the Indictment. The Government understands that Defendant's Sentencing Memorandum will seek to defend and explain his actions with respect to other counts of the Indictment. The

3

as follows:

> On or about December 22, 2002 the Government of Iraq gave Defendant
> MUTHANNA AL-HANOOTI, and Defendant MUTHANNA AL-HANOOTI
> unlawfully accepted within the Eastern District of Michigan, an allocation of two
> million barrels of Iraqi oil. Beginning no later than December 2002 and
> continuing through in or about February 2003, in the Eastern District of
> Michigan, Defendant MUTHANNA AL-HANOOTI knowingly and willfully
> dealt in the allocation by causing a contract between the State Oil Marketing
> Organization (SOMO) (a Government of Iraq entity) and LARU, Ltd. (LARU)
> (an agent of Defendant MUTHANNA AL-HANOOTI) to be procured on his
> behalf, committing LARU to transfer money to the Government of Iraq in
> exchange for two million barrels of Iraqi oil. At no time did defendant
> MUTHANNA AL-HANOOTI receive a license or other authorization from the
> Secretary of the Treasury to procure, transfer, or resell Iraqi oil or otherwise deal
> in any interest in Iraqi oil.

The companies and individuals selected for oil allocations were able to profit by selling

their allocations to brokers and/or companies capable of transporting the oil to a refinery.

According to FBI information, Defendant could have expected to receive a commission up to

$100,000 for this transfer.[3]

## III.  ARGUMENT

A District Court must impose a sentence "sufficient, but not greater than necessary, to

comply" with the purposes of 18 U.S.C. § 3553(a)(2). *United States v. Lanesky*, 494 F.3d 558,

561 (6th Cir. 2007).  Section 3553(a)(2) lists the following purposes of sentencing: (A) to reflect

the seriousness of the offense, to promote respect for the law, and to provide just punishment for

---

Government submits that these arguments are not relevant to the sentencing issues before the
Court.  Should the Court find otherwise, the Government requests the opportunity to submit a
supplemental Memorandum.

[3]According to Defendant, he would have realized a profit of approximately $40,000 for
the sale of the two-million barrel allocation.

the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from

further crimes of the defendant; and (D) to provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner.

In seeking to achieve these purposes, the Court must consider: (1) the nature and

circumstances of the offense and the history and characteristics of the defendant; (2) the

purposes listed above; (3) the kinds of sentences available; (4) the appropriate sentencing

guideline range; (5) any other pertinent policy statement issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct; and (7) the need to provide restitution to any

victims of the offense.  18 U.S.C. § 3553(a).

Although the Guidelines are no longer mandatory after *United States v. Booker*, 543 U.S.

220 (2005), "a district court should begin all sentencing proceedings by correctly calculating the

applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The U.S. Supreme

Court explained in *Gall* that "[a]s a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark." *Id.*  Then,

"after giving the parties an opportunity to argue for whatever sentence they deem appropriate,

the district judge should then consider all of the 3553(a) factors to determine whether they

support the sentence requested by a party." *Id.*  The Court "may not presume that the Guidelines

range is reasonable." *Id* at 50.

Here, a 46-month sentence will reflect the seriousness of the offense, promote respect for

the law, provide just punishment, and afford adequate deterrence to Defendant and others who

would seek to violate IEEPA.

## A. **The Applicable Sentencing Guidelines Range**

Pursuant to the Rule 11 Plea Agreement, the parties have stipulated that the Guideline that applies to Defendant's guilty plea is U.S.S.G. § 2M5.3. Furthermore, the Government has agreed to seek a term of imprisonment no greater than the low end of the Guidelines range, which in this case is 46 months. The parties have also agreed that Defendant's criminal history category is Category I.

## B. **The Nature and Circumstances of the Offense**

In direct contravention of IEEPA and the Iraqi Sanctions Regulations, Defendant willfully chose to unlawfully accept a valuable allocation of oil from the Iraqi government that was subject of the sanctions regime described herein. More specifically, Defendant caused a contract between SOMO and an oil trading company, Laru, to be procured on his behalf. In December 2002, in a document deemed top secret by the Government of Iraq, the Vice President of Iraq directed the Iraqi Minister of Petroleum to allocate to Al-Hanooti the right to purchase two millions barrels of Iraqi oil. In January 2003, Al-Hanooti advised SOMO that he had assigned his two million barrel allocation to Laru. In February 2003, Al-Hanooti contacted SOMO to discuss the assignment of his oil allocation to Laru and he was informed that SOMO was willing to execute a contract with Laru acting on his behalf. That same month, a contract was entered into between SOMO and Laru, entitling Laru to purchase two million barrels of Iraqi oil through the end of March 2003. At the end of February, the Government of Iraq ratified the oil contract and the United Nations approved it. The contract was never performed because of the commencement of military operations in Iraq in March 2003.

As Defendant was engaging in this transaction, in late 2002 and early 2003, war between

6

the United States and Iraq was imminent.  Defendant chose to ignore the national emergency that had been declared with respect to Iraq and, instead, consummate for his own benefit a significant financial transaction with the highest levels of the Saddam Hussein regime.

Defendant "does not dispute that the Vice President of Iraq directed [sic] Minister of petroleum to allocate a contract for the sale of oil for the benefit of Al-Hanooti, and that Al-Hanooti accepted the same." *Defendant's Objections to PSR* at 2.  Defendant claims that the allocation was simply a gift from the government of Iraq for past humanitarian efforts on behalf of the people of Iraq.  However, Defendant's conduct would be illegal even if the oil allocation was a "gift."  Defendant has admitted that high-ranking Iraqi official Naji Sabri Al-Hadithi ("Al-Hadithi")[4] proposed giving him the oil allocation (or "coupon")  in order for FAAIR to expand its liaison work in Iraq; and Defendant told the FBI that he intended to use the money to create print publications and a video documentary about United Nations sanctions against Iraq and the humanitarian conditions created by the sanctions, i.e., matters that were very much of concern for the Saddam Hussein regime.  Accordingly, by Defendant's own admission the oil allocation was clearly a payment for services rendered to Iraq in the past, in the future, or both.  In any event, the allocation was not a gift.

## C.  <u>History and Characteristics of the Defendant</u>

Under 18 U.S.C. § 3553(a)(1), the Court should also consider the history and characteristics of the defendant.  Defendant was born in Iraq in 1959 and became a naturalized U.S. citizen in 1995.  Defendant has no criminal history, a factor already considered in the

---

[4]Defendant has variously described Al-Hadithi as either the Iraqi Minister of Foreign Affairs or the Iraqi Minister of Oil at the end of the Saddam Hussein regime.

calculation of the Guidelines range.  However, Defendant's criminal activity here evinces a willful scheme to profit financially from the Saddam Hussein regime.  Rather than being the result of a single mistake or bad decision, Defendant's crime was the result of a protracted effort to secure the oil allocation; indeed, Defendant has told the FBI that he first discussed the oil allocation with Al-Hadithi approximately one year before the 2002 Congressional delegation.  In sum, Defendant placed his personal interests ahead of respect for the law and should be sentenced accordingly.

### D.  **The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public**

Deterrence and promoting respect for the law should be a principal goal of the Court's sentence.  A significant sentence will serve as a true warning to the next person who finds himself or herself tempted to do business with a sanctioned country, and make it plain to such a wrongdoer that there is a significant legal consequence for violating an embargo for personal profit.  The imposition of a 46-month sentence will send a message that IEEPA violations are - as Congress, the President, the Department of Treasury, and the Guidelines intended them to be - grave matters of national security that warrant meaningful punishment.

### E.  **Departures and Variances**

Courts should still consider, though they are not bound by, Guidelines advice on departures.  *United States v. Forrest*, 402 F.3d 678, 689-90 (6th Cir. 2006).  Even though the Guidelines are advisory rather than mandatory, they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Gall*, 552 U.S. at 46.  If the Court finds a sentence outside the Guidelines range is warranted, the Court "must consider the extent of the deviation and ensure that the justification is

sufficiently compelling to support the degree of the variance." *Id.* at 50. A "major departure should be supported by a more significant justification than a minor one." *Id.*

In his objections to the Presentence Investigation Report, Defendant has indicated that he considers himself eligible for a departure based on his "extraordinary service to the United States during the early months of its occupation of Iraq by serving as a liaison with local government and other officials and the Coalition Occupation Authority in the Baghdad area." However, the facts do not bear out Defendant's assertions.

First, Defendant has told the FBI that, following the entry of coalition forces into Iraq in March 2003, he made approximately two or three visits to Iraq. Defendant has further stated that during these visits to Iraq he acted in his capacity as President of FAAIR and that he met with representatives of the U.S. military to discuss humanitarian issues, cultural awareness, and prevention of terrorism in Iraq. However, Defendant could only recall by name one U.S. official with whom he met and he told the FBI that no U.S. government entity instructed Defendant to perform any tasks, nor did the U.S. government offer or pay anything for Defendant or FAAIR. Defendant should not receive a departure for merely doing his job at FAAIR. *Cf. United States v. Repking*, 467 F.3d 1091, 1095-96 (7th Cir. 2006) (charitable works not extraordinary because they were within the scope of defendant's job responsibilities as president of a bank).

Second, Defendant has argued that he should receive a departure because he worked under "extraordinarily difficult physical conditions at great personal risk, [and] provided invaluable assistance to U.S. officials seeking to establish a working relationship with the Sunni community in Baghdad and the surrounding area." However, the only substantiated "risk" Defendant encountered in Iraq arose not from work he did on behalf of the U.S. government, but

rather in his individual capacity as President of FAAIR. Defendant told the FBI that in March 2004 he traveled by car with a driver from Amman to Baghdad on behalf of FAAIR and was accosted and robbed at gunpoint. Defendant specifically told the FBI that he was using LRD funding for the trip and was intending to do work that would further justify LRD support. To the extent Defendant exposed himself to any "risk" it was on account of his own work for FAAIR and LRD, not the U.S. government.

Even if Defendant's activity in Iraq could be considered service to the United States, which it cannot, it is not sufficient basis for a departure. Pursuant to U.S.S.G. § 5H1.11, civic, charitable, or public service and prior good works are not ordinarily relevant in determining whether a departure is warranted. *See, e.g., United States v. Gaines*, 295 F.3d 293, 303 (2d Cir. 2002) (denying downward departure based on a defendant's prior cooperation with prosecution where that cooperation occurred far in the past and, therefore, was 'akin' to prior good works); *United States v. Morken*, 133 F.3d 628 (8th Cir. 1998) (charitable and community contributions not extraordinary for someone of defendant's income and position); *United States v. Serrata*, 425 F.3d 886, 914 (10th Cir. 2005) (totality of the circumstances did not justify departure based on employment history and civic, charitable, and public service activities where such activities are commendable but not 'present to an unusual degree' as required by U.S.S.G. § 5K2.0).

### F. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

It is the Government's understanding that Defendant will request a sentence of probation. This request is unreasonable given the seriousness of the offense, as well as the fact that it would be at odds with the sentence imposed in a recent, similar case in this District.

The starting point in the Court's analysis under § 3553(a)(6) is the sentences of

Case 2:08-cr-20083-PDB-VMM ECF No. 62 filed 03/11/11 PageID.189 Page 11 of 13

"defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). On June 9, 2009 Judge Nancy G. Edmunds sentenced defendant Najib Shemami to 46 months of incarceration following his January 2009 plea to Conspiracy to Violate IEEPA (18 U.S.C. § 371, 50 U.S.C. § 1705(b)). Pursuant to the plea agreement in that case, the parties stipulated that the sentence of incarceration would not exceed 57 months, based on a stipulated Guidelines range of 46-57 months, the same range at issue here. Shemami had been charged in a four count indictment with conspiracy to act as an agent of a foreign government (18 U.S.C. §§ 371, 951(a)), acting as an agent of a foreign government (18 U.S.C. § 951(a)), violating IEEPA (50 U.S.C. § 1701 et seq.), and making a false statement (18 U.S.C. § 1001(a)(2)). The charges against Shemami are very similar to the charges against Defendant and both defendants ultimately pled guilty to the same offense - violating IEEPA. That Shemami received a 46-month sentence in this District less than two years ago on the same charge is compelling support for the Government's requested sentence and demonstrates that similarly situated defendants have been sentenced to significant periods of incarceration. Accordingly, the Government's request of 46 months incarceration for Defendant is appropriate.

## IV.  CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court

impose a sentence of 46 months.

Respectfully submitted,

MICHAEL J. MULLANEY
Acting United States Attorney

By:

KARL A. SANDOVAL
JOSHUA J. LAROCCA
Department of Justice
National Security Division
950 Pennsylvania Avenue
Washington, D.C. 20530
(202) 514-5385

Dated: March 11, 2011

12

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Linda Moreno, Esq.

JOSHUA J. LAROCCA
U.S. Department of Justice
National Security Division
10th & Constitution Ave., N.W.
Washington, D.C. 20530
Tel: 202-305-4568
joshua.larocca@usdoj.gov